# In the United States Court of Federal Claims

No. 13-1025C
(Filed: January 15, 2016)

| | | |
|---|---|---|
| *************************************** | | |
| JANIE WEEKS, | * | |
| | * | RCFC 56; Summary Judgment; Genuine |
| Plaintiff, | * | Issue of Material Fact |
| | * | |
| v. | * | |
| | * | |
| THE UNITED STATES, | * | |
| | * | |
| Defendant. | * | |
| *************************************** | | |

Anthony Bush, Montgomery, AL, for plaintiff.

James Sweet, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Before the court is defendant's motion to dismiss pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Plaintiff, Janie Weeks, claims that defendant, the United States Department of Housing and Urban Development ("HUD") breached an express contract with her when it failed to award her $175,000 in severance pay plus six months of health insurance coverage for her and her family, in return for her resignation from the Housing Authority of the City of Opp, Alabama. ("OHA"). For the reasons set forth below, defendant's motion is denied.

### I. BACKGROUND

Plaintiff is a resident of Geneva County, Alabama, and a former employee of the OHA. Compl. ¶¶ 4, 16. Plaintiff began her employment with the OHA in 1999, when she was hired as an Occupancy Clerk. Id. ¶ 17. Following various promotions, she ultimately became the Executive Director of the OHA in 2006. Id.

On or around June 7, 2010, HUD's Office of Fair Housing and Equal Opportunity began conducting a compliance review of two OHA programs pursuant to 1) Section 504 of the Rehabilitation Act of 1973; 2) Title II of the Americans with Disabilities Act of 1990; and 3) Title VI of the Civil Rights Act of 1964. Def.'s Mot., App. 1. On September 30, 2010, following the completion of the week-long review, HUD sent plaintiff two letters: 1) a "Preliminary Letter of Noncompliance" as to Section 504 and Title II; and 2) "Letter of

Findings" as to Title VI.  Id.  In these two letters, HUD informed plaintiff that it had determined that the OHA was in non-compliance with all three statutes.  Id.

On November 10, 2010, HUD sent plaintiff a "Letter of Determination of Non-Compliance."  Id. at 29.  In the letter's conclusion section, HUD stated the following:

> The Department would like to review these matters as soon as possible.  Such resolution must be reduced to a written Voluntary Compliance Agreement (VCA) with a clear timetable for implementation.  See 24 CFR § 8.56(j) and 42 USC § 200 et seq.  After your receipt of this Letter of Determination, you have ten (10) calendar days to voluntarily comply with this Letter of Determination, in the form of a Voluntary Compliance Agreement (VCA).  If you fail to meet this deadline, HUD shall proceed with formal means of compliance as outlined in 24 CFR § 8.57.

Id. at 46.

On May 16, 2011, HUD sent Allen Johnston, Chairman of the OHA's Board of Commissioners, a copy of the VCA.  Id. at 47.  On June 7, 2011, HUD sent Johnston a corrected copy of the same document and confirmed that negotiations as to the VCA would occur on June 23-24, 2011.  Id.  Included in the draft VCA attached to the June 7, 2011 letter was a section captioned "Specific Provisions."  Id. at 57.  One of the specific provisions, captioned "Termination of Executive Director Janie Weeks," stated the following:

> 1. The OHA shall terminate the employment of Executive Director, Janie Weeks, with an effective date no later than June 23, 2011.
>
> 2. As an alternative to the termination of Executive Director, Janie Weeks as set forth above, the OHA may certify prior to June 23, 2011, that Executive Director Janie Weeks has submitted her resignation and the OHA has accepted that resignation.  Further that the effective date of her resignation is a date prior to but not later than June 23, 2011.
>
> 3. The OHA shall not consider Ja[n]ie Weeks for re-employment.
>
> 4. The Board shall immediately initiate a search for a new Executive Director whose employment will be subject to the review and prior approval of the Office of Fair Housing and Equal Opportunity and the Office of Public and Indian Housing.

Id. at 59.

On June 23-24, 2011, HUD and OHA officials met at the Chamber of Commerce Center in Opp, Alabama.  Compl. ¶ 31.  In attendance were, inter alia, the following individuals: 1) plaintiff; 2) plaintiff's husband; 3) the Board of Commissioners of the OHA, including Charles Willis and Allen Johnston; 4) Adrian Fields, on behalf of HUD; 5) Brenda Shavers, on behalf of HUD; 6) Natasha Watson, on behalf of HUD; and 7) Julie Moody, attorney for the OHA.  Id.; Pl.'s Opp'n.  The parties discussed the terms of plaintiff's resignation during the two days of meetings.

The VCA was finalized in November of 2011.  Def.'s Mot., App. 112-50.  It included a specific provision captioned "Resignation of Executive Director Jane Weeks, which stated the following:

1. The Board shall provide written proof that Executive Director, Janie Weeks has submitted her written resignation and written proof that the OHA Board has accepted that resignation.  Further that the effective date of her resignation is a date prior to the date of the acceptance and signing of this agreement.

2. The OHA Board shall provide a copy of all documents related to the resignation including but not limited to the specific terms and conditions of the resignation.

3. The OHA Board shall also provide written proof that all conditions of the resignation of Janie Weeks have been met prior to the date of the acceptance and signing of this agreement.

4. The terms of the resignation must preclude the OHA Board from ever hiring Janie Weeks for re-employment with OHA in any capacity.

Id. at 119.

## II.  LEGAL STANDARDS

### A.  RCFC 56

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is genuine if it "may reasonably be resolved in favor of either party."  Id. at 250.

3

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."). Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. However, if neither party meets this burden on the filing of cross-motions for summary judgment, then the court must deny both motions. See, e.g., Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 723 (2009); Dick Pac./GHEMM, JV v. United States, 87 Fed. Cl. 113, 126 (2009).

**B. The Tucker Act**

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584 (1941). A waiver of immunity "cannot be implied but must be unequivocally expressed." United States v. King, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Loveladies Harbor, Inc. v. United States, 27 F.3d 1545, 1554

(Fed. Cir. 1994) (en banc). "[I]n a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." Holmes v. United States, 657 F.3d 1303, 1314 (Fed.Cir.2011).

In order to invoke Tucker Act jurisdiction based upon an express or implied-in-fact contract, a plaintiff must allege all of the requisite elements of a contract with the United States, Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 731 (2010) (stating that an implied-in-fact contract "requires the existence of the same elements as an express contract"), which requires "a mutual intent to contract including offer, acceptance, and consideration," Total Med. Mgmt., Inc. v. United States, 104 F.3d 1314, 1319 (Fed. Cir. 1997). Additionally, any "contract with the United States . . . requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997); accord Lion Raisins, Inc. v. United States, 54 Fed. Cl. 427, 431 (2002) (stating that a plaintiff must "allege mutual intent to contract including an offer, an acceptance, consideration and facts sufficient to establish that the contract was entered into with an authorized agent of the United States who 'had actual authority to bind the United States.'" (quoting Trauma Serv. Grp., 104 F.3d at 1325)).

### III. DISCUSSION

#### A. The Parties' Arguments

Defendant puts forth two arguments in support of its motion for summary judgment. First, defendant contends that it is entitled to summary judgment because there is no genuine issue of material fact as to whether an alleged oral agreement pertaining to plaintiff's resignation was reduced to writing; the parties agree that it was not. Def.'s Mot. 6. According to defendant, this is significant because, it argues, the terms of plaintiff's resignation were incorporated into the VCA, which, by regulation, was required to be reduced to writing. Id. at 6-7. In the alternative, defendant argues that it is entitled to summary judgment pursuant to the parole evidence rule, upon the theory that the alleged oral agreement is invalid and unenforceable because its terms conflict with those of a subsequent written contract. Id. at 8.

Plaintiff counters that, although the oral agreement pertaining to plaintiff's resignation was never reduced to writing, it remains a valid oral agreement because it was separate and distinct from the VCA. Pl.'s Opp'n 6-7. According to plaintiff, the meetings that occurred on June 23 and 24, 2011, "were about securing the resignation or termination of Weeks—nothing more and nothing less," and [f]or HUD to now argue that the negotiations regarding Weeks' resignation or termination [were] somehow part of the negotiations under the VCA is disingenuous, at best, as that certainly was not the intent of the HUD employees in attendance at said meetings." Id. at 7. With respect to the parole evidence rule, plaintiff claims that it is irrelevant because there were two distinct agreements. Id. Finally, plaintiff claims that even assuming the oral agreement merged into the final written contract, the parole evidence rule still does not apply because the two agreements do not contain conflicting terms. Id. at 8.

## B. Analysis

The gravamen of plaintiff's complaint is that defendant breached an express oral contract that was reached on or about June 23-24, 2011. According to plaintiff, not only did the parties reach an express oral contract, but this contract was separate and distinct from the written contract that was approved as part of the parties' VCA, even though both agreements dealt with the terms of plaintiff's resignation. Thus, the narrow issue before the court is whether there is a genuine issue of material fact as to the existence of an express oral contract that would preclude the granting of summary judgment in this case. The answer is yes.

The elements of an express oral contract are the same as those of a written contract: mutuality of intent to be bound, definite offer, unconditional acceptance, and consideration. Edwards v. United States, 22 Cl. Ct. 411, 420 (1991) (citing Essen Mall Properties v. United States, 21 Cl. Ct. 430, 440 (1990); Pacific Gas & Elec. Co. v. United States, 3 Cl. Ct. 329, 339 (1983), aff'd, 738 F.2d 452 (Fed. Cir. 1984); City of Klawock v. United States, 2 Cl. Ct. 580, 584 (1983), aff'd, 732 F.2d 168 (Fed. Cir. 1984)). "In addition, since one of the parties to the contract is the federal government, plaintiff must show that 'the officer whose conduct is relied upon had actual authority to bind the government in contract.'" Edwards, 22 Cl. Ct. at 420 (quoting H.F. Allen Orchards v. United States, 749 F.2d 1571, 1575 (Fed. Cir.1984)).

In this case, plaintiff cites the deposition testimony of Ms. Moody and Messrs. Willis and Johnston in support of her contention that an express oral contract was formed. The court reviews each of these testimonies below.

First, according to Ms. Moody, the following is true:

1. The primary purpose of the June 23-24, 2011 meetings was to discuss Weeks' termination. Pl.'s Opp'n, Moody Depo. 14.

2. At a certain point on June 23, 2011, the parties began to discuss whether a settlement offer could be made to induce plaintiff to voluntarily resign. Id. at 24.

3. On the morning of June 24, 2011, prior to the beginning of the second day of meetings, plaintiff told Ms. Moody that she would resign if certain conditions were met. Id. at 29.

4. After Ms. Moody relayed plaintiff's proposal to HUD officials at the meeting, Ms. Fields indicated that she did not have the authority to approve such a proposal and that she had to make a phone call. Id. at 33.

5. Ms. Fields later indicated to Ms. Moody that she had spoken to Ed Sprayberry and that HUD, through the OHA, had agreed to pay plaintiff $125,000 and provide her and

        her family with six additional months of health care coverage. Id. at 33-34, 37.

6. Ms. Fields told Ms. Moody that on Tuesday, June 28, 2011, they would receive a check for the funds promised plaintiff. Id. at 39.

7. After the conclusion of the June 24, 2011 meeting, Ms. Moody returned to the OHA offices to accept plaintiff's keys and personal items from her. Id. at 43.

8. Ms. Moody planned to be back in touch with Ms. Fields on Tuesday, June 28, 2011, in order to arrange for the receipt of plaintiff's funds. Id. at 43-44. Ms. Moody also planned to meet with plaintiff on June 29, 2011 to obtain her signature on a voluntary resignation. Id. at 44.

9. The agreement as to plaintiff's retirement was never reduced to writing. Id. at 45.

10. On September 15, 2011, Ms. Moody sent a letter to James Blackmon, who works in HUD's Office of Counsel, noting that plaintiff and the OHA had reached an agreement, which was later rejected by HUD. Id. at 46.

11. Part of the settlement agreement with plaintiff included the OHA's obtaining certain releases from tenants who had filed complaints against it. Id. at 42, 60-61. In addition, as part of the settlement agreement, plaintiff agreed that she would continue to assist the OHA in its response to the complaints. Id.

12. On June 28, 2011, Ms. Moody had a conference call with Mr. Johnston and Ms. Fields. Id. at 62-63. During that call, Ms. Fields told Ms. Moody that HUD was not going to pay plaintiff the settlement money that had been negotiated. Id. at 64.

13. After the OHA Board learned that HUD was not going to fund the settlement agreement, they placed plaintiff on administrative leave. Id. at 68. When the OHA attempted to pay her, HUD froze the account. Id.

Second, according to Mr. Willis, the following is true:

1. On June 24, 2011, HUD agreed to pay plaintiff severance pay.  Pl.'s Opp'n, Willis Depo. 24.

2. According to the terms of the settlement agreement, plaintiff was to leave immediately and was to obtain releases from various people who had filed grievances against the OHA in return for $125,000 and a term of health care coverage.  Id. at 27-28.

3. The terms of the settlement agreement were never reduced to writing.  Id. at 30.

4. Upon learning of HUD's refusal to pay plaintiff according to the terms of the settlement agreement, the OHA Board convened a meeting.  Id.  Plaintiff had not resigned at that point.  Id. at 31.

5. Two sets of negotiations occurred on June 23-24, 2011.  Id. at 32-36.

6. Plaintiff's employment with the OHA ended in October of 2011.  Id. at 40.

7. Plaintiff received one check from the OHA for $7,000.  Id. at 41.

8. HUD agreed that the terms of plaintiff's settlement agreement included $125,000 in severance pay.  Id. at 44-45.

9. In July of 2011, Mr. Johnston called for a meeting of the OHA Board to discuss the fact that HUD had refused to honor its agreement with plaintiff.  Id. at 48-49.

10. Plaintiff was placed on administrative leave from June 24, 2011 through October 20, 2011 and she received compensation during that period.  Id. at 51.

Finally, according to Mr. Johnston, during the June 23-24, 2011 meetings between the OHA and HUD, HUD agreed to pay plaintiff $125,000 in return for her resignation.  Pl.'s Opp'n, Johnston Depo. 16.

Although Ms. Moody's testimony alone is sufficient to create a genuine issue of material fact regarding the existence of an agreement separate from the VCA that was also negotiated on June 23-24, 2011, when combined with the testimonies of Messrs. Willis and Johnston, there can be no doubt that plaintiff has met her burden in this case.  Plaintiff, through the deposition

testimonies attached to her opposition, has demonstrated that there is a genuine issue of material fact as whether the parties came to an express oral agreement.  Stated differently, the court cannot state with certainty 1) that both parties intended to be bound; 2) that HUD made a definite offer to plaintiff; 3) that plaintiff's acceptance was unconditional; 4) that plaintiff gave consideration; <u>and</u> 5) that the individuals who negotiated the agreement on behalf of HUD had the authority to bind the United States in contract.  Having thus shown the existence of a genuine issue of material fact, the court need not discuss the parties' arguments as to the parole evidence rule.

## IV.  CONCLUSION

For these reasons, the court denies defendant's motion for summary judgment.  By no later than February 16, 2016, the parties shall file a joint status report suggesting further proceedings.

**IT IS SO ORDERED.**

<u>/s Margaret M. Sweeney</u>
MARGARET M. SWEENEY
Judge