# In the United States Court of Federal Claims

No. 13-1025C
(Filed:  July 24, 2019)

```
*************************************
JANIE WEEKS,                        *
                                    *
               Plaintiff,           *
                                    *
        v.                          *        Trial; Breach of Contract; Oral Agreement;
                                    *        Necessary Authority; Ratification
THE UNITED STATES,                  *
                                    *
               Defendant.           *
*************************************
```

Anthony B. Bush, The Bush Law Firm LLC, Montgomery, AL, for plaintiff.

Steven M. Mager and Agatha Koprowski, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this case, plaintiff Janie Weeks contends that the United States Department of Housing and Urban Development ("HUD") breached an oral contract to pay her $125,000 and provide six months of health insurance in exchange for her voluntary resignation as executive director of the Opp Housing Authority.  As explained below, the court concludes that (1) no such contract was ever consummated because no government official with the necessary authority agreed to Ms. Weeks's offer and (2) HUD did not subsequently ratify the alleged contract.  Accordingly, the court denies Ms. Weeks's claim for relief.

## I.  BACKGROUND

### A.  Statutory and Regulatory Context

Congress created the federal public housing program when it passed the United States Housing Act of 1937 ("Housing Act of 1937").[1]  The purposes of the Housing Act of 1937 are to

---

[1]  Part I of this Opinion and Order contains the court's findings of fact as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims.  The court derives these facts from the "Stipulated Facts" portion of the parties' Amended Joint Stipulations of Fact ("Stip."); the transcript of testimony elicited at trial ("Tr."); the exhibits admitted into evidence during trial ("PX" or "DX"); relevant statutes, regulations, and prior decisions; and matters of

"assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families" and to "address the shortage of housing affordable to low-income families." 42 U.S.C. § 1437(a)(1) (2012). The federal government advances these objectives through local public housing authorities.[2] Id. § 1437(a)(1)(C). A public housing authority is "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." Id. § 1437a(b)(6)(A).

Under Section 8 of the Housing Act of 1937, as amended ("Section 8"), HUD provides benefits to low-income families through rent subsidies paid by public housing authorities directly to landlords. Id. § 1437f; 24 C.F.R. § 982.1(a)(1) (2019). The housing choice voucher program administered pursuant to Section 8 is "the federal government's major program for assisting very low-income families, the elderly, and the disabled to afford decent, safe, and sanitary housing in the private market." Housing Choice Vouchers Fact Sheet, U.S. Dep't of Hous. & Urban Dev., https://www.hud.gov/program_offices/public_indian_housing/programs/hcv/about/fact_sheet [http://web.archive.org/web/20190724182914/https://www.hud.gov/program_offices/public_indi an_housing/programs/hcv/about/fact_sheet]. Public housing authorities receive funds to administer one or more Section 8 housing assistance payment programs via an "annual contributions contract" wherein the public housing authority "agrees to administer the program in accordance with HUD regulations and requirements." 24 C.F.R. § 982.151(a)(1); see also id. § 982.153 (listing certain requirements). Public housing authorities are prohibited from using program funds for expenditures not contained within HUD-approved budgets. Id. § 982.157.

Section 9 of the Housing Act of 1937, as amended ("Section 9"), also assists low-income families by allowing HUD to "make annual contributions to public housing [authorities] to assist in achieving and maintaining the lower income character of [public housing authority] projects."[3] 42 U.S.C. § 1437c(a)(1). A "project" is "housing [that is] developed, acquired, or assisted" by a

---

which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence. Citations to the trial transcript will be to the page number of the transcript and the last name of the testifying witness.

[2] The relevant statutes and regulations generally refer to "public housing agencies" rather than "public housing authorities." The distinction is purely semantic. Because the parties refer to such organizations as "public housing authorities," the court uses that term as well.

[3] Congress established two sources of funds to accomplish its public housing objectives under Section 9: the Capital Fund and the Operating Fund. 42 U.S.C. § 1437g(c)(1). The purpose of the Capital Fund is to "mak[e] assistance available to public housing [authorities] to carry out capital and management activities." Id. § 1437g(d)(1). The purpose of the Operating Fund is to "mak[e] assistance available to public housing [authorities] for the operation and management of public housing." Id. § 1437g(e)(1). Besides making annual contributions from the Capital Fund and the Operating Fund, HUD may also award grants to public housing authorities for the purpose of constructing public housing projects pursuant to forty-year contracts. 42 U.S.C. § 1437c(a)(2). Such development grants are not at issue in the instant case.

public housing authority, including "improvement of any such housing." <u>Id.</u> § 1437a(b)(1).
Tenants living in public housing authority projects must generally qualify as "low-income" and
pay monthly rent (to the public housing authority that owns the project) in an amount that is
limited by their monthly income, which must be reviewed annually (or every three years for
families on fixed incomes). <u>Id.</u> § 1437a(a)(1).  Each public housing authority that manages a
project receives, in addition to rents from tenants, operating subsidies from HUD pursuant to an
"[a]nnual contributions contract" in which the public housing authority "agrees to comply with
HUD requirements for the development and operation of its public housing projects."[4]  24 C.F.R.
§ 990.115.  Public housing authorities' Section 9 program budgets are subject to HUD approval
and oversight.  <u>See id.</u> § 990.315.

The Office of Public and Indian Housing ("Public Housing") is the HUD component
tasked with overseeing public housing authorities generally—including, as relevant here, the
housing choice voucher program and public housing authority projects.  <u>About PIH</u>, U.S. Dep't
of Hous. & Urban Dev., https://www.hud.gov/program_offices/public_indian_housing/about
[http://web.archive.org/web/20190724183337/https://www.hud.gov/program_offices/public_indi
an_housing/about].  Public Housing's mission is to "ensure[] safe, decent, and affordable
housing, create[] opportunities for residents' self-sufficiency and economic independence, and
assure[] the fiscal integrity of all program participants."  <u>Id.</u>

Residents of public housing authority projects, recipients of Section 8 rent vouchers, and
prospective participants in those programs are protected by various civil rights statutes, including
the following:

- Section 504 of the Rehabilitation Act of 1973, as amended
  ("Section 504"), provides that "[n]o otherwise qualified
  individual with a disability in the United States . . . shall, solely
  by reason of her or his disability, be excluded from the
  participation in, be denied the benefits of, or be subjected to
  discrimination under any program or activity receiving Federal
  financial assistance or under any program or activity conducted
  by [HUD]."  29 U.S.C. § 794 (2006).

---

[4]  A public housing authority is eligible to receive an operating subsidy from the
Operating Fund in an amount equal to the excess of its "formula expense" over its "formula
income," subject to congressional appropriations.  24 C.F.R. § 990.110(a)(2), (b)(3).  Formula
income is an estimate of the public housing authority's income exclusive of any operating
subsidy—i.e., the rent charged to tenants and the length of time for which units are leased.  <u>Id.</u>
§ 990.195(a).  Formula expense is the "costs of services and materials needed by a well-run
[public housing authority] to sustain the project . . . such as administration, maintenance, and
utilities."  <u>Id.</u> § 990.160(a).  HUD pays the annual operating subsidy to public housing
authorities in monthly installments.  <u>Id.</u> § 990.210(a).

- Part A of Title II of the Americans with Disabilities Act of 1990 ("ADA") extends the same protections of Section 504 to participants in state and local programs.  42 U.S.C. §§ 12131-12132.

- Title VI of the Civil Rights Act of 1964 ("Title VI") prohibits adverse treatment "on the ground of race, color, or national origin" to participants in "any program or activity receiving Federal financial assistance."  Id. § 2000d.

- The Fair Housing Act prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," on the basis of "race, color, religion, sex, familial status, or national origin," id. § 3604(b), or because of a handicap of "that person," "a person residing in or intending to reside in that dwelling," or "any person associated with that person," id. § 3604(f)(2).[5]

Violation of these and other civil rights statutes can result in adverse action by HUD and other federal agencies.  24 C.F.R. § 103.5.  In addition to investigating complaints, HUD "may also initiate compliance reviews [pursuant to] appropriate civil rights authorities."  Id. § 103.204(a)-(b).  The HUD component responsible for implementing and enforcing civil rights laws is the Office of Fair Housing and Equal Opportunity ("Fair Housing").  About FHEO, U.S. Dep't of Hous. & Urban Dev., https://www.hud.gov/program_offices/fair_housing_equal_opp/aboutfheo [http://web.archive.org/web/20190724184404/https://www.hud.gov/program_offices/fair_housing_equal_opp/aboutfheo].

## B.  The Opp Housing Authority

HUD components are divided into ten regions, and the regions are further divided into field offices.  Contact HUD:  Alabama, U.S. Dep't of Hous. & Urban Dev., https://www.hud.gov/states/alabama/offices [http://web.archive.org/web/20190724184524/https://www.hud.gov/states/alabama/offices].  Region IV—which includes Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, Puerto Rico, South Carolina, Tennessee, and the U.S. Virgin Islands—is based in Atlanta, Georgia.  Id.  The field office for Alabama is in Birmingham.  Id.

---

[5] Discrimination includes "refusal to permit . . . reasonable modifications of existing premises occupied or to be occupied" and "a refusal to make reasonable accommodations in rules, policies, practices, or services."  42 U.S.C. § 3604(f)(3).

The Opp Housing Authority "is a public housing authority that provides housing for low-income tenants in the town of Opp, Alabama."  Stip. ¶ 1.  It administers approximately 100 Section 8 vouchers in cooperation with sixty landlords and operates five housing projects consisting of 170 total units.  DX 2 at 2, 17; DX 22 at 725.  The Opp Housing Authority is a public corporation under Alabama law and is subject to the "rules and regulations prescribed by HUD and other Federal agencies."  Stip. ¶¶ 2-3.  A five-member board of commissioners ("board") appointed by the mayor oversees the Opp Housing Authority.  DX 2 at 13; Tr. 144 (Willis), 451 (Ringhausen).  The board employs an executive director who is responsible for day-to-day operations.  DX 2 at 14.  The executive director manages a staff of six employees that have either front office or maintenance duties.  Id. at 7, 14.

Ms. Weeks first began working for the Opp Housing Authority as an occupancy clerk in 1999.  Stip. ¶ 5.  She was later promoted to the positions of Section 8 coordinator and general operations manager before becoming the executive director in 2006.  Id. ¶ 6; DX 22 at 733; Tr. 24-25 (Weeks).  Ms. Weeks received several raises over the years and earned $74,713 per annum as of June 2011.  PX 23 at 1; DX 22 at 728; Tr. 71, 94-95 (Weeks).  She also received health insurance coverage and participated in a retirement program as part of her overall compensation package.  See PX 23 at 1.  Specifically, the Opp Housing Authority paid Ms. Weeks $1,436.78 weekly (before deductions for taxes, retirement, and health insurance), and provided her with a monthly travel allowance for using her personal vehicle for Section 8 inspections, out of the general fund.  Id. at 1-2; Tr. 94-96 (Weeks).  In addition to amounts deducted from her pay for required tax withholding, Ms. Weeks contributed $86.21 from each weekly paycheck towards retirement and $230.00 from the last paycheck of each month for her share of health insurance premiums.  PX 20-23.

On June 17, 2010, the Opp Housing Authority entered into an annual contributions contract with HUD that superseded the prior such contract and incorporated by reference Title 24 of the Code of Federal Regulations.  See generally PX 25 (containing an excerpt of the annual contributions contract between the Opp Housing Authority and HUD).  As part of that contract, the Opp Housing Authority agreed to comply with all applicable civil rights laws and regulations.  Id. at 5.  The Opp Housing Authority also agreed that it would "not incur any operating expenditures except pursuant to an approved operating budget" absent unforeseen exigencies.  Id.  Pursuant to the contract, the Opp Housing Authority maintained two bank accounts at CCB Community Bank:[6]  a general fund for operating its public housing projects and

---

[6]  CCB Community Bank was known as Covington County Bank when the Opp Housing Authority executed a General Depository Agreement on March 22, 2007.  See CCB Community Bank, Nat'l Info. Ctr., Fed. Fin. Insts. Examination Council, https://www.ffiec.gov/npw/ Institution/Profile/655839?dt=20170517 [http://web.archive.org/web/20190724184854/ https://www.ffiec.gov/npw/Institution/Profile/655839?dt=20170517] (reflecting the name change); compare PX 14 (General Depository Agreement dated March 22, 2007, between the Opp Housing Authority and Covington County Bank), with PX 22 (paycheck dated June 10, 2011, to Ms. Weeks drawn on CCB Community Bank).

a separate Section 8 fund.[7]  Id. at 4; PX 14 at 1.  Withdrawals from the general fund were permitted only for operational costs in connection with the housing projects and "such other purposes as may be specifically approved by HUD."  PX 25 at 4.  To that end, the Opp Housing Authority's General Depository Agreement with CCB Community Bank provided:

> If [CCB Community Bank] receive[s] written notice from HUD that no withdrawals by the [Opp Housing Authority] from the Accounts are to be permitted, [CCB Community Bank] shall not honor any check or other order to pay from the Accounts . . . , or permit any withdrawals by the [Opp Housing Authority] from said accounts until [CCB Community Bank] is authorized to do so by written notice from HUD.

PX 14 at 1; accord 24 C.F.R. § 982.156(d).

## C. HUD Reviews the Opp Housing Authority

On June 7, 2010, HUD began reviews of the Opp Housing Authority's program management and civil rights compliance.  Stip. ¶ 8.  To lessen the burden on the Opp Housing Authority, Fair Housing and Public Housing conducted simultaneous reviews.  Tr. 245 (Watson).  Public Housing staff from the Birmingham field office were on site at the Opp Housing Authority from June 7 through 11 to conduct a management and technical assistance review to assess the Opp Housing Authority's "management of HUD programs and services to residents."  DX 14 at 320.  The Public Housing review "focused on individual files, policies, and procedures," as well as on "performance evaluations" and other materials "that dealt with . . . management" of the Opp Housing Authority.  Tr. 318 (Peterson-Fields).  In addition, Fair Housing staff from the Birmingham field office were on site from June 8 through 11 to review the Opp Housing Authority's compliance with Section 504, the ADA, and Title VI.  DX 2 at 2.  The Fair Housing review included examining documents, viewing units, and conducting interviews with residents and staff.  Tr. 247-50 (Watson).

---

[7]  For the 2010 fiscal year, HUD provided the Opp Housing Authority with a $498,573 operating subsidy from the Operating Fund and a $244,427 contribution from the Capital Fund pursuant to Section 9.  DX 22 at 725.  That same year, HUD also provided the Opp Housing Authority with $324,811 to administer the local housing choice voucher program under Section 8.  Id.  The record does not reflect the amount of rent that the Opp Housing Authority received from its tenants.  Public housing authorities are also permitted to maintain a certain amount of reserves to cover unexpected expenses.  The specific amount that the Opp Housing Authority maintained in reserves is also not reflected in the record.

On August 26, 2010, Fair Housing sent its management confirmatory and technical assistance review, which contained various "findings, recommendations, and concerns," to each member of the Opp Housing Authority board and Ms. Weeks, and directed the Opp Housing Authority to submit a corrective action plan.  DX 14 at 318.  Fair Housing then issued a preliminary letter of noncompliance on September 30, 2010.  Stip. ¶ 9.  In that letter, Fair Housing indicated that it hoped to resolve the identified deficiencies as soon as possible, and explained:

> Such resolution must be reduced to a written Voluntary Compliance Agreement . . . with a clear timetable for implementation.  After you receive this [letter of finding], [Fair Housing] will contact you to coordinate mutually convenient dates . . . to negotiate the terms of the draft [Voluntary Compliance Agreement].  [Fair Housing] will send you a proposed [Voluntary Compliance Agreement] in advance of this meeting.

DX 2 at 19 (citation omitted) (relying on 24 C.F.R. § 8.56(j)(2)).

The Opp Housing Authority did not request a review of the findings contained in Fair Housing's preliminary letter of noncompliance within the thirty-day period for doing so.  DX 3 at 1.  Accordingly, on November 10, 2010, Fair Housing issued a Letter of Determination of Non-Compliance to the Opp Housing Authority indicating that Fair Housing had "sustain[ed]" those earlier findings.  Id.; Stip. ¶ 10.  Fair Housing reiterated that it hoped to promptly resolve the identified deficiencies:

> Such resolution must be reduced to a written Voluntary Compliance Agreement . . . with a clear timetable for implementation.  . . .  [Y]ou have ten (10) calendar days to voluntarily comply with this Letter of Determination, in the form of a Voluntary Compliance Agreement . . . .  If you fail to meet this deadline, HUD shall proceed with formal means of compliance as outlined in 24 C.F.R. § 8.57.

DX 3 at 18 (citations omitted).

Fair Housing sent a draft Voluntary Compliance Agreement to the Opp Housing Authority on May 16, 2011, and then sent an updated version on June 7, 2011.  Stip. ¶¶ 11-12.  The following individuals received copies of the updated draft Voluntary Compliance Agreement:  Allen Johnston, the Opp Housing Authority board chair; Ms. Weeks; H.D. Edgar, the Opp mayor; Ed Sprayberry, the Public Housing director for Alabama; and Edward Jennings, the HUD Region IV administrator.  DX 4 at 179-80.  The purpose of the Voluntary Compliance Agreement, as explained by Fair Housing, was to "outlin[e] the remedies needed to bring the Opp Housing Authority into compliance" with Section 504, the ADA, and Title VI.  Id. at 179.  As relevant here, the updated draft Voluntary Compliance Agreement provided:

1.  The [Opp Housing Authority] shall terminate the employment of Executive Director, Janie Weeks, with an effective date no later than June 23, 2011.

2.  As an alternative to the termination of [Ms. Weeks], the [Opp Housing Authority] may certify prior to June 23, 2011, that [Ms. Weeks] has submitted her resignation and the [Opp Housing Authority] has accepted that resignation.  Further that the effective date of her resignation is a date prior to but no later than June 23, 2011.

3.  The [Opp Housing Authority] shall not consider [Ms. Weeks] for re-employment.

4.  The Board shall immediately initiate a search for a new Executive Director whose employment will be subject to the review and approval of [Fair Housing] and [Public Housing].

Id. at 191.  The provisions pertaining to the termination of Ms. Weeks were not included in the May 16, 2011 version of the draft Voluntary Compliance Agreement.  See id. at 179; Tr. 32-33 (Weeks).

### D.  Negotiations Regarding the Voluntary Compliance Agreement

Fair Housing, Public Housing, and the Opp Housing Authority board convened at the Opp Chamber of Commerce on Thursday, June 23, 2011, for the purpose of "reaching a resolution to the findings needed to bring the Opp Housing Authority into compliance."  DX 4 at 179; accord Stip. ¶¶ 13, 15; Tr. 27 (Weeks).  The following individuals were present for the June 23, 2011 meeting:[8]

- Brenda Shavers—center director, Fair Housing;

- Natasha Watson—field office director, Fair Housing;[9]

- Adrian Peterson-Fields—division director, Public Housing;

---

[8]  The positions noted next to each participant's name reflects the participants' positions held as of the date of the meeting, i.e., June 23, 2011.

[9]  Ms. Watson reported to Ms. Shavers.  Tr. 278 (Watson), 391 (Shavers).  As field office director, Ms. Watson oversaw civil rights enforcement for Fair Housing in Alabama.  Id. at 240 (Watson).  As center director, Ms. Shavers oversaw civil rights enforcement for Fair Housing in Georgia, Alabama, and Mississippi.  Id. at 388 (Shavers).

- Jacklyn Ringhausen—deputy regional counsel, HUD Region IV;

- Samantha Holloway—staff attorney, HUD Region IV;

- Ms. Weeks—executive director, Opp Housing Authority;

- James Weeks—Ms. Weeks's husband;

- Mr. Johnston—chair, Opp Housing Authority board;

- Charles Willis—member, Opp Housing Authority board;

- Glenda Presley—member, Opp Housing Authority board;

- Olean Nelson—member, Opp Housing Authority board;

- Danny Hall—member, Opp Housing Authority board; and

- Julie Moody—outside counsel, Opp Housing Authority board.

PX 15; Tr. 184-88 (Moody), 240 (Watson), 313-14 (Peterson-Fields), 387, 409 (Shavers), 511, 515 (Murray).  Mr. Weeks left the meeting shortly after it began at approximately 8:00 a.m. and did not return.  Tr. 31-32 (Weeks), 192 (Moody).  The remaining participants then discussed the draft Voluntary Compliance Agreement.  Id. at 33 (Weeks), 189 (Moody).  The provisions other than the termination of Ms. Weeks were quickly resolved; the discussion then focused on the termination of Ms. Weeks, at which point she departed the meeting.  Id. at 34 (Weeks), 141 (Willis), 190 (Moody), 280 (Watson), 424 (Shavers), 464 (Ringhausen).  Ms. Nelson and Mr. Hall also left early.  Id. at 192 (Moody).  Ms. Weeks returned to her office at the Opp Housing Authority, and sought advice from Mickey McGinnis, who had been the executive director of the Montgomery Housing Authority before receiving a severance package for his voluntary resignation in lieu of termination.  Id. at 36 (Weeks), 380 (Peterson-Fields).

The board resisted Fair Housing's demand to terminate Ms. Weeks because it had no documentation in its files to justify that action.  Id. at 148 (Willis), 330 (Peterson-Fields).  According to Mr. Willis, the board was "happy" with Ms. Weeks's performance and had been unaware, prior to the June 23, 2011 meeting, of any specific complaints regarding Ms. Weeks.  Id. at 145, 148 (Willis); accord id. at 26 (Weeks).  According to Ms. Moody, the board was "very disturbed" by the termination of Ms. Weeks being added to the Voluntary Compliance Agreement, id. at 191 (Moody), because of the lack of grounds for doing so, id. at 217.  The topic of Ms. Weeks's termination dominated the rest of the meeting that day.  Id. at 193.  The meeting concluded in the late afternoon with the negotiations at a "stalemate" and a plan to meet the next day, id. at 331 (Peterson-Fields); accord id. at 150 (Willis), to determine when substantive negotiations would continue, id. at 470 (Ringhausen).  There was no plan to "conduct[] business" on the second day other than "agreeing to a date to reconvene."  Id. at 416

(Shavers).  The purpose of waiting until a later date to continue substantive negotiations regarding the Voluntary Compliance Agreement was to allow the board to have time to discuss matters internally.  Id. at 470 (Ringhausen).

After the meeting concluded, Ms. Moody met with the Opp Housing Authority board at Ms. Presley's home.  Id. at 194 (Moody).  The board did not want to "open[] themselves up to liability for terminat[ing] Ms. Weeks without grounds."  Id.  The board decided that it would not terminate Ms. Weeks, but instead attempt to "reach a resolution of a voluntary resignation."  Id. at 194-95.  Ms. Moody spoke with Ms. Weeks that evening by telephone and asked her to tell the board what she wanted in exchange for her voluntary resignation.  Id. at 36 (Weeks), 195 (Moody).

The following morning—Friday, June 24, 2011—Ms. Moody met with Ms. Weeks outside the Opp Chamber of Commerce offices to ascertain whether Ms. Weeks had an offer to present.  Id. at 39-40 (Weeks), 196 (Moody).  Ms. Weeks indicated that she would accept monetary compensation of $175,000 and six months of health insurance coverage in exchange for her voluntary resignation.  Id. at 38-39, 80 (Weeks), 196-97 (Moody).  The settlement offer was based on the terms of Mr. McGinnis's settlement with the Montgomery Housing Authority.  See DX 25 at 3.  Ms. Moody then met with two of the board members outside before entering the meeting.  Tr. 40 (Weeks), 196-97 (Moody).

Ms. Weeks returned to her office and did not attend the June 24, 2011 meeting.  Id. at 40 (Weeks), 197 (Moody).  Ms. Ringhausen and Ms. Holloway also did not attend the meeting, instead returning to Atlanta—Ms. Ringhausen due to a personal matter and Ms. Holloway because the meeting was not intended to cover any legal matters.  Id. at 471-72 (Ringhausen).  Ms. Peterson-Fields from Public Housing and Ms. Shavers and Ms. Watson from Fair Housing did, however, attend the June 24, 2011 meeting on behalf of HUD.  Id. at 280 (Watson).  A quorum of the Opp Housing Authority board, including Mr. Johnston and Mr. Willis, was also present, as was Ms. Moody.  Id. at 168 (Willis), 199 (Moody).

Mr. Johnston presented Ms. Weeks's proposal at the outset of the meeting and negotiations ensued.  Id. at 197 (Moody).  In the late morning, the parties agreed that (1) Public Housing would provide the Opp Housing Authority with funds by Wednesday, June 29, 2011, to pay Ms. Weeks $125,000 and provide six months of health insurance coverage for her family; (2) Ms. Weeks would receive payment of approximately $5,700 for her accrued leave; (3) Ms. Weeks would immediately vacate her position; (4) Fair Housing would obtain releases from certain individuals who had filed complaints with HUD regarding Ms. Weeks; and (5) Ms. Weeks would formally sign a voluntary resignation and liability release upon receiving payment.  Id. at 44 (Weeks), 197-203 (Moody), 284 (Watson), 344 (Peterson-Fields).

Ms. Peterson-Fields indicated that she needed to speak with her supervisor, Mr. Sprayberry, regarding the agreement, and used her cell phone to reach him at 10:32 a.m.  Id. at 332 (Peterson-Fields); Stip. ¶ 14; DX 10 at 11.  Only Public Housing was concerned with the monetary portion of the settlement since Fair Housing does not disburse appropriated funds.  Tr. 284-85 (Watson), 419 (Shavers).  Mr. Sprayberry directed Ms. Peterson-Fields to report that

Public Housing needed to confer with HUD officials at the regional level and that she would return the following week to finalize the deal, and she reported as such. Id. at 332-33 (Peterson-Fields). Ms. Moody recalled that after Ms. Peterson-Fields "indicate[d] there was an agreement," the meeting participants "began to make preparations in compliance with" the agreement's terms. Id. at 199 (Moody). Ms. Moody was determined to resolve the dispute. Id. at 201. When Ms. Moody suggested that the Opp Housing Authority write a check for the severance payment to Ms. Weeks on the spot, Ms. Peterson-Fields stated that Public Housing had to "go through the regional process to see if it was approvable." Id. at 333 (Peterson-Fields). Neither Donnie Murray, regional counsel for HUD Region IV, nor Ms. Ringhausen, his deputy, was contacted on June 24, 2011, to discuss terms, obtain approval of the agreement, or for any other purpose. Id. at 511, 515 (Murray).

Ms. Moody and Mr. Johnston went to Ms. Weeks's office to notify her that HUD had agreed to a severance payment that was less than the amount Ms. Weeks had requested; specifically, Ms. Weeks would receive $125,000 and six months of health insurance, but she would need to resign immediately. Id. at 43 (Weeks), 201 (Moody). To that end, Ms. Moody and Mr. Johnston worked through lunch to assist Ms. Weeks in cleaning out her office. Id. at 43-44 (Weeks), 201 (Moody). Ms. Moody explained that "HUD" would return the following week with the funds and "finalize everything then." Id. at 44 (Weeks). Although Ms. Weeks was skeptical that HUD would follow through with the agreement, Ms. Moody assured her that HUD had "agreed to the severance package" and would be back. Id. Ms. Weeks finished cleaning out her office, surrendered her keys, and returned home. Id. at 44, 52. Meanwhile, Ms. Watson obtained releases from the aforementioned complainants after informing them that Ms. Weeks had agreed to resign. Id. at 44 (Weeks), 285-86 (Watson). A meeting involving Mr. Sprayberry, Ms. Peterson-Fields, Mr. Johnston, and Ms. Moody was scheduled for the following Monday, June 27, 2011. DX 5 at 411.

Also on Friday, June 24, 2011, the Opp Housing Authority issued Ms. Weeks her regular weekly paycheck for the week ending Friday, June 24, 2011, PX 20, pursuant to its standard practice, see PX 21 (June 17, 2011 paycheck for the week ending June 17, 2011); PX 22 (June 10, 2011 paycheck for the week ending June 10, 2011); PX 23 at 1 (June 3, 2011 paycheck for the week ending June 3, 2011); Tr. 94 (Weeks). The Opp Housing Authority also issued a check to Ms. Weeks for a gross amount of $5,747.12 (net amount $3,714.91) to compensate her for accrued but unused leave.[10] PX 19; Tr. 344 (Peterson-Fields).

_____

[10] Because the check number for the leave payout is 10247, PX 19, and the check number for the June 24, 2011 paycheck is 10244, PX 20, the leave payout check was apparently written sometime after the June 24, 2011 paycheck. However, the leave payout check is dated one day earlier, i.e., June 23, 2011. PX 19. Since the Opp Housing Authority typically issued paychecks to Ms. Weeks on Friday, the court assumes that the June 23, 2011 date for check number 10247 reflects a typographical error.

### E.  HUD Rejects Ms. Weeks's Settlement Offer

Over the weekend, Ms. Peterson-Fields corresponded with Mr. Sprayberry via e-mail. See DX 5 at 410-11.  On Sunday evening, June 26, 2011, Mr. Sprayberry asked:  "Who from HUD agreed on the settlement amount?"  Id. at 410.  The following morning—Monday, June 27, 2011—Ms. Peterson-Fields responded:  "No one at all!  Thus, this meeting to discuss."  Id.

The meeting originally scheduled for Monday, June 27, 2011, was rescheduled for the following day.  Tr. 341-42 (Peterson-Fields).  Ms. Peterson-Fields returned to Opp for the June 28, 2011 meeting.  Id. at 336-37.  Ms. Moody and Mr. Johnston were also present.  Id. at 204 (Moody).  Mr. Sprayberry, Mr. Murray, and other HUD staff participated by telephone.  Id. at 204 (Moody), 340-41 (Peterson-Fields).  The purpose of the meeting was to review "the different elements of the proposal that the [Opp Housing Authority] board had put before [Public Housing]" and compare the proposal to the "findings [by] Fair Housing."  Id. at 341 (Peterson-Fields).  During that meeting, Public Housing officials averred that "there was no agreement, and they would not be providing any funds."  Id. at 205 (Moody); accord id. at 360-61 (Peterson-Fields) (indicating that after Ms. Moody reviewed the terms of the settlement offer, both Mr. Sprayberry and Mr. Murray stated that they did not agree to its terms).  Ms. Moody noted that the Opp Housing Authority had sufficient funds to pay the settlement amount, but Public Housing "refused permission to use it."  Id. at 205 (Moody).  Further negotiations ensued, but no agreement was reached.  Id. at 361 (Peterson-Fields).  Mr. Murray offered a three-month severance, asked Ms. Moody to communicate the offer to Ms. Weeks, and discussed HUD's authority to review and approve settlements.  DX 22 at 731.

### F.  Further Negotiations Regarding Ms. Weeks's Resignation

The following day—June 29, 2011—several HUD officials discussed the situation regarding Ms. Weeks's resignation via e-mail and during a conference call.  See generally DX 25.  Public Housing expressed reticence to pay the $125,000 amount based on Ms. Weeks's annual salary.  Id. at 3.  Ms. Peterson-Fields stated that Ms. Weeks should not receive any payment, but if HUD was going to pay her, the amount should be equal to three to nine months' salary.  Id. at 2; Tr. 347-48 (Peterson-Fields).  Ms. Peterson-Fields did not oppose paying for six months of health insurance and allowing Ms. Weeks to retain her retirement benefits if Ms. Weeks was going to receive a monetary payment, and suggested that the $5,747.12 accrued leave payout that Ms. Weeks had received should count towards any settlement amount.  DX 25 at 2; Tr. 348-49 (Peterson-Fields).

Ms. Moody contacted Ms. Peterson-Fields that same afternoon concerning Ms. Weeks's severance package.  DX 25 at 1.  Ms. Moody relayed Ms. Weeks's (1) rejection of the June 28, 2011 offer of a three-month severance and (2) counteroffer of a $100,000 payment as the sole financial consideration (i.e., no health insurance or retirement compensation) in exchange for her voluntary resignation.  Id.  Ms. Peterson-Fields circulated the counteroffer to Mr. Sprayberry, Ms. Holloway, Ms. Watson, and others.  Id.  Approximately two weeks later, on July 13, 2011, the Opp Housing Authority board met to "discuss the situation" of "not having the agreement culminated" because the board was concerned about needing to protect itself.  Tr. 157-58

(Willis); accord id. at 109 (Weeks).  According to Mr. Willis, the board "determined that [Ms. Weeks] must still be an employee . . . [b]ecause the agreement was not finalized" since "[s]he did not receive the severance of $125,000."  Id. at 152-53 (Willis).  The board placed Ms. Weeks on paid administrative leave, meaning she "should have been fully compensated," pending the outcome of the dispute.  Id. at 162-63; accord id. at 108-10, 113-14 (Weeks).

On Friday, July 29, 2011, Mr. Willis suggested via e-mail that it was "in the best interest of the [Opp Housing Authority] and all concerned" that the dispute regarding Ms. Weeks be resolved.  DX 15 at 423.  He proposed that Public Housing allow the Opp Housing Authority to settle the dispute for an amount equivalent to the remainder of Ms. Weeks's salary and health insurance for the year.  Id.  The record contains no indication that Public Housing ever responded directly to Mr. Willis.

 On August 2, 2011, the Opp Housing Authority issued check number 10357 to Ms. Weeks for a gross amount of $7,183.90 (net amount $3,973.39).  PX 19.  This check represented five weeks of salary that had been unpaid since June 24, 2011—i.e., through Friday, July 29, 2011; it contained five weeks of retirement deductions and a deduction for one month of health insurance coverage.  Id.; accord DX 15 at 423.  The check was successfully negotiated.  DX 15 at 423; Tr. 104 (Weeks), 159 (Willis), 363 (Peterson-Fields), 496-97 (Ringhausen).  That same day, Mr. Sprayberry expressed concern that the Opp Housing Authority board would "issue other checks without [Public Housing's] approval" and suggested that Public Housing use the Opp Housing Authority's General Depository Agreement with CCB Community Bank to "lock Federal Funds."  DX 15 at 423; see also 24 C.F.R. § 982.156(d) (discussing applicable procedures).  He indicated that Public Housing could do so with the concurrence of Ms. Ringhausen (among others), who was part of that discussion.  DX 415 at 23.  Approximately one week later, on or about August 9, 2011, Public Housing invoked its right to freeze the bank's ability to disburse Opp Housing Authority funds without Public Housing's explicit approval.  Id. at 422; Tr. 114 (Weeks), 163 (Willis), 363-64 (Peterson-Fields), 494-95 (Ringhausen); see also Tr. 166 (Willis) (agreeing that the Opp Housing Authority "does not operate any bank accounts that are not controlled by HUD").

On Thursday, August 11, 2011, the Opp Housing Authority issued Ms. Weeks a check for a gross amount of $2,873.56 to represent two additional weeks of salary—i.e., through Friday, August 12, 2011.  Tr. 104-05 (Weeks).  Ms. Weeks received the check in the mail two days later, i.e., on Saturday, August 13, 2011, and attempted to cash it at CCB Community Bank.  Id. at 57.  The bank refused to honor the check, explaining that it had been instructed not to cash any checks made payable to Ms. Weeks.[11]  Id. at 57-58 (Weeks), 364-66 (Peterson-Fields).

---

[11]  In her testimony regarding a dishonored check appearing on pages 57 and 58 of the trial transcript, Ms. Weeks was responding to questions pertaining to the August 2, 2011 check (number 10357).  See Tr. 56-58 (Weeks).  However, Ms. Weeks later testified that there was one check issued in August 2011 that CCB Community Bank refused to honor, and she did not know whether it was the August 2 check or the August 11 check.  See id. at 104-06.  Other testimony indicates that the bank honored the August 2 check and refused to honor the August 11 check, e.g., id. at 176-77 (Willis), 363-66 (Peterson-Fields), and the court so finds.

-13-

On Monday, August 15, 2011, Michael Cohan, an attorney representing Ms. Weeks in her official capacity as executive director regarding complaints filed with HUD, wrote to Mr. Murray concerning the unresolved situation regarding Ms. Weeks's employment. DX 23 at 1; Tr. 113-14 (Weeks). Mr. Murray responded four days later, and emphasized that "any settlement that contemplates the use of funds controlled by the [annual contributions contract] must be expressly approved by [himself] and [Mr. Sprayberry]" and that "[n]o such approval ha[d] been granted." DX 23 at 242. There is no evidence in the record to suggest that Ms. Weeks ever demanded reinstatement to her position after her paychecks ceased to be honored or was ever afforded the opportunity to address the charges asserted by HUD that formed the basis of the agency's decision to demand her termination over the Opp Housing Authority's objections.

### G. Ending the Dispute

Thus, the Opp Housing Authority board resolved, on October 20, 2011, to officially terminate Ms. Weeks's employment as executive director. DX 8; Tr. 162-63 (Willis). In its resolution, the board explained that Public Housing would "not approve a search and/or advertisement for an Executive Director for the Opp Housing Authority without the resignation and/or termination" of Ms. Weeks and that the board needed to "take formal action to vacate the position of Executive Director" so that a search could commence. DX 8. According to Mr. Willis, the board decided to officially terminate Ms. Weeks's employment because it had "gone four months without an executive director" and it was "very difficult to operate the [Opp Housing Authority] without someone in charge." Tr. 163 (Willis). The board issued a formal termination letter to Ms. Weeks on October 28, 2011. Id. at 162.

Ms. Weeks also received a letter from her health insurance provider that her family's health insurance was cancelled due to the termination of her employment. See id. at 117 (Weeks). She then paid approximately $980 each month from October 2011 through January 2012 for COBRA health care continuation coverage.[12] Id. at 117-18. Ms. Weeks would have paid in advance for coverage for the following month; in other words, her COBRA continuation coverage was in effect from November 2011 (the month following her termination, and also the month after the month in which she made her initial payment) through February 2012 (the month after the month in which she made her last payment). See 26 C.F.R. §§ 54.4980B-7 (discussing the duration of COBRA continuation coverage), 54.4980B-8 (discussing payment for COBRA continuation coverage).

Shortly after Ms. Weeks's formal termination, the Opp Housing Authority and HUD entered into a Voluntary Compliance Agreement. See generally PX 26. The agreement was signed on November 7, 2011, by Ms. Nelson, Mr. Johnston, and Mr. Willis on behalf of the Opp Housing Authority board and on November 15, 2011, by Ms. Shavers on behalf of Fair Housing.

---

[12] "COBRA continuation coverage" is an election, after a "qualifying event," "to receive the group health plan coverage that is provided to similarly situated nonCOBRA beneficiaries (ordinarily, the same coverage that the qualified beneficiary had on the day before the qualifying event)." 26 C.F.R. § 54.4980B-5 (2011). As relevant here, a "qualifying event" can include termination of employment. Id. § 54.4980B-4.

Id. at 42.  As relevant here, the Voluntary Compliance Agreement contained provisions requiring the board to provide written proof to Fair Housing that Ms. Weeks was no longer employed as executive director and precluding the board "from ever hiring [Ms. Weeks] for re-employment with [the Opp Housing Authority] in any capacity."  Id. at 11.  Ms. Weeks was not a party to that agreement.

## H.  Procedural History

Ms. Weeks filed suit against the Opp Housing Authority and members of the Opp Housing Authority board in their official capacities on November 28, 2011, in the United States District Court for the Middle District of Alabama ("Alabama district court") to enforce the alleged settlement agreement.  Weeks v. Hous. Auth. of Opp, Ala., No. 2:11-cv-01011-MEF-TFM (M.D. Ala. filed Nov. 28, 2011).  Ms. Weeks later amended her complaint to add the Secretary of HUD (in his official capacity) and HUD itself as defendants.  Weeks v. Hous. Auth. of Opp, Ala., 887 F. Supp. 2d 1232, 1235 (M.D. Ala. 2012).  On August 24, 2012, the Alabama district court held that although Ms. Weeks asserted various constitutional claims, including denial of due process, her claims sounded in contract.  Id. at 1236-37.  The court emphasized that the United States Court of Federal Claims ("Court of Federal Claims") "has exclusive jurisdiction over contract claims against the Federal Government," id. at 1239, and dismissed the Secretary of HUD and HUD as defendants, id. at 1239-40.  The court explained:

> [Ms.] Weeks argues that she does not have an adequate remedy under the Tucker Act because the [Court of Federal Claims] cannot grant equitable relief.  In her view, this prohibition on the [Court of Federal Claims'] jurisdiction expands the jurisdiction of [federal district courts] to accommodate what she wants—an equitable ruling that HUD must authorize [the Opp Housing Authority] to pay her under the contract.  But this argument ignores that HUD was a party to the contract giving rise to her claim against [the Opp Housing Authority] for money damages . . . , so [HUD] can be sued in the [Court of Federal Claims] under the Tucker Act for contract damages.

Id. at 1239.

On September 5, 2013, the Alabama district court found that "HUD [was] a required party but [could not] be joined" since the court lacked jurisdiction to consider Ms. Weeks's breach-of-contract claim against HUD.  Weeks v. Hous. Auth. of Opp, Ala., 292 F.R.D. 689, 693 (M.D. Ala. 2013).  Based on its finding that HUD was an indispensable party, the court determined that it could not "allow [the] case to proceed against [the Opp Housing Authority] in HUD's absence" and dismissed the case.  Id. at 695.

Following the dismissal of her Alabama district court case, Ms. Weeks filed her complaint in the instant case on December 30, 2013, asserting only a breach-of-contract claim and seeking injunctive relief thereunder.  The parties engaged in discovery, and defendant moved

for summary judgment.  On January 15, 2016, the undersigned concluded that there was "a genuine issue of material fact as whether the parties came to an express oral agreement" and denied the summary judgment motion.  Weeks v. United States, 124 Fed. Cl. 630, 636 (2016).  After several enlargements of the trial schedule due to the unavailability of Ms. Weeks and her counsel, the court conducted a three-day trial in Montgomery, Alabama from March 5 through 7, 2018.[13]  The parties then submitted posttrial briefs, concluding on March 29, 2019, and then requested that the court decide the matter on the record and the posttrial briefs.

## II.  STANDARD OF REVIEW

To prove a breach of contract, a plaintiff must establish "(1) a valid contract between the parties; (2) an obligation or duty arising from that contract; (3) a breach of that duty; and (4) damages caused by the breach."  Century Expl. New Orleans, LLC v. United States, 110 Fed. Cl. 148, 163 (2013) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)).  Once a breach of contract is established, the burden shifts to the defendant to plead and prove affirmative defenses that excuse the breach.  Shell Oil Co. v. United States, 751 F.3d 1282, 1297 (Fed. Cir. 2014) (citing Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1360 (Fed. Cir. 2009)).

The requirements for establishing a contract with the federal government—whether express or implied—are "(1) mutuality of intent to contract, (2) consideration, (3) lack of ambiguity in offer and acceptance, and (4) actual authority of the government representative whose conduct is relied upon to bind the government."  Moda Health Plan, Inc. v. United States, 892 F.3d 1311, 1328 (Fed. Cir. 2018) (internal quotation marks omitted) (quoting Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995)), cert. granted, 87 U.S.L.W. 3492 (U.S. June 27, 2019) (No. 18-1028).

> "Actual authority may be either express or implied."  Liberty Ammunition, Inc. v. United States, 835 F.3d 1388, 1402 (Fed. Cir. 2016).  A government representative "possesses express authority to obligate the government only when the Constitution, a statute, or a regulation grants it to that employee in unambiguous terms."  Abraham v. United States, 81 Fed. Cl. 178, 186 (2008) (emphases omitted).  Implied authority, in turn, exists only when that authority is an "integral part of the duties assigned to the government employee," i.e., "when the government employee could not perform his or her assigned tasks without such authority."  Liberty Ammunition, 835 F.3d at 1402.

Anoruo v. United States, 759 F. App'x 956, 961 (Fed. Cir. 2019) (unpublished per curiam decision) (alterations omitted).

---

[13]  During trial, the court heard testimony from Ms. Weeks, Mr. Willis, Ms. Moody (who was, at the time of trial, a state district judge in Covington County, Alabama), Ms. Watson, Ms. Peterson-Fields, Ms. Shavers, Ms. Ringhausen, and Mr. Murray.

## III.  ANALYSIS

The central issue in this case is whether a government representative with actual authority to bind the government entered into a contract with Ms. Weeks.  Ms. Weeks contends that Mr. Sprayberry had express actual authority (or alternatively, implied actual authority) to bind HUD, and that the other HUD officials who travelled to Opp on June 24, 2011, had, at a minimum, implied actual authority to enter into agreements necessary to resolve the Voluntary Compliance Agreement, including the resignation of Ms. Weeks.  Defendant argues that there was no enforceable contract between Ms. Weeks and HUD because no HUD official present at the June 24, 2011 meeting had either express or implied actual authority to enter into an oral agreement regarding payment in exchange for Ms. Weeks's resignation.  Defendant is correct.

### A.  Authority to Approve a Settlement

As an initial matter, it is important to distinguish between negotiating the terms of the Voluntary Compliance Agreement and negotiating a settlement regarding Ms. Weeks's resignation.  While Fair Housing insisted that the Opp Housing Authority end its affiliation with Ms. Weeks, Fair Housing was not concerned with the particulars of doing so.  Those details were between the Opp Housing Authority, Public Housing, and Ms. Weeks.  Further, no official from Fair Housing—as relevant here, Ms. Watson and Ms. Shavers—had any authority, express or implied, to approve a monetary settlement regarding Ms. Weeks's resignation.  As testified to by both Ms. Watson and Ms. Shavers, Fair Housing's mission concerns civil rights enforcement; Fair Housing does not disburse appropriated funds to public housing authorities.  Tr. 240, 284-85 (Watson), 388-89, 419 (Shavers).  The expenditure of appropriated funds falls within the purview of Public Housing.  See id. at 519 (Murray).

The HUD Litigation Handbook contains provisions that speak to the procedures for approving settlements.[14]  See generally DX 1 (providing a complete copy of U.S. Dep't of Hous. & Urban Dev., Litigation Handbook 1530.1 REV-5 (May 18, 2004)).  The HUD Litigation Handbook contemplates threatened as well as instituted litigation, litigation against HUD directly, and litigation in which HUD has an interest due to the involvement of HUD-funded activities.  Id. at 340-41.  The regional counsel has primary responsibility for overseeing all litigation activity within the geographic region.  See id. at 382.  As relevant here, with respect to litigation involving public housing authorities, the regional counsel must approve any settlements:

---

[14]  The current version of the HUD Litigation Handbook was issued on May 18, 2004, and remains in effect.  Litigation Handbook (1530.1), U.S. Dep't of Hous. & Urban Dev., https://www.hud.gov/program_offices/administration/hudclips/handbooks/ogch/15301 [http://web.archive.org/web/20190724185947/https://www.hud.gov/program_offices/administration/hudclips/handbooks/ogch/15301].

> Regional Counsel is authorized to approve a proposal for
> settlement with the concurrence of the appropriate Program
> Official . . . where the amount of the settlement, including fees and
> costs, will not exceed $500,000.

Id. at 388.  Indeed, public housing authorities may not unilaterally settle litigation without such concurrence:

> No settlement arising out of litigation shall be accepted by
> a [public housing authority] without the prior written concurrence
> of HUD.  The terms of any such offer shall be communicated in
> writing to the Regional Counsel together with the
> recommendations of the [public housing authority] for disposition
> and the arguments in support of those recommendations.

Id. at 391.  At the time of the events in question, Mr. Murray was the regional counsel.  Tr. 511 (Murray).  The appropriate program official with respect to the instant case was Mr. Sprayberry, the director of Public Housing for the state of Alabama.  Id. at 519, 522.

Thus, approval of a settlement agreement regarding Ms. Weeks's resignation would have required the following steps:  (1) transmission of a written proposal to Mr. Murray, the regional counsel; (2) transmission of the Opp Housing Authority's written recommendation and supporting arguments to Mr. Murray; (3) concurrence of Mr. Sprayberry; and (4) Mr. Murray's written approval of the settlement proposal.  See id. at 519-22; see also id. at 525-26 (describing the purpose for requiring written documentation that "set[s] forth the reasons for the settlement").  Mr. Murray would occasionally give preliminary oral approval for monetary settlements, but still always required written documentation before finalizing his approval.  Id. at 528.

Ms. Ringhausen, as deputy regional counsel, had the "identical" position description as Mr. Murray, acted for him in his absence, and was the point person for litigation issues.  Id. at 443 (Ringhausen).  Therefore, Ms. Ringhausen also had at least implied actual authority to approve a written settlement proposal regarding Ms. Weeks's resignation (with the concurrence of Mr. Sprayberry and based upon Opp Housing Authority's written recommendation).  On the other hand, there is no evidence to suggest that Mr. Sprayberry delegated his authority to Ms. Peterson-Fields or that Ms. Peterson-Fields otherwise possessed implied actual authority.

## B. Nobody With Authority Approved the Settlement

The evidence in the trial record reflects that at most, the parties entered into a tentative oral agreement on June 24, 2011.  Indeed, Ms. Moody testified credibly that she was led to believe that the offer of Ms. Weeks's resignation in exchange for a $125,000 severance payment plus six months of health insurance coverage had been orally accepted by Mr. Sprayberry as communicated through Ms. Peterson-Fields.  The parties do not dispute that the alleged oral agreement was never reduced to writing.  Unfortunately for Ms. Weeks, that fact is fatal to her

claim.  None of the HUD representatives who participated (in person or telephonically) in the June 24, 2011 negotiations had any authority, express or implied, to orally approve a binding settlement for three independent reasons.

First, Mr. Sprayberry could not unilaterally approve any settlement, in writing or otherwise.  As outlined in the HUD Litigation Handbook, Mr. Sprayberry's approval was only one of several steps necessary for there to be a binding agreement.  Mr. Murray's or Ms. Ringhausen's approval was also necessary.  See id. at 522 (Murray) (emphasizing that Mr. Sprayberry's approval without the concurrence of regional counsel would have been an "ultra[ vires] act").  However, neither Mr. Murray nor Ms. Ringhausen attended the June 24, 2011 meeting, and there is no evidence to suggest that either of them was contacted at any point that day regarding a settlement pertaining to Ms. Weeks's resignation.

Second, there was no transmission of a written proposal or justifications in support thereof on June 24, 2011.  While the multiple e-mail messages sent the following week and thereafter could arguably constitute such transmission, they were not sent prior to or contemporaneously with the alleged oral agreement.  Mr. Murray, or Ms. Ringhausen acting in his stead, lacked the authority to officially approve a settlement offer without first receiving a written proposal and justifications in support thereof.  After the terms of Ms. Weeks's offer were communicated via e-mail to both Mr. Sprayberry and Mr. Murray, each of them promptly rejected the offer.

Finally, assuming for the sake of argument that HUD (i.e., the necessary officials from both Public Housing and the regional counsel's office) orally agreed to Ms. Weeks's settlement proposal on June 24, 2011, that agreement was preliminary in nature only.  According to the HUD Litigation Handbook, a settlement is not valid "without the prior written concurrence of HUD."  DX 1 at 391 (emphasis added).  In other words, HUD lacked the authority to orally enter into a binding agreement to resolve the dispute surrounding Ms. Weeks's resignation.  To wit,

> if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

Restatement (Second) of Contracts § 27 cmt. b (Am. Law Inst. 1981).  Because the HUD Litigation Handbook is a publicly available document, the Opp Housing Authority (including its then-outside counsel, Ms. Moody) and Ms. Weeks had "reason to know" that the purported acceptance of Ms. Weeks's offer had to be reduced to writing before becoming a valid contract.  See, e.g., Central Pines Land Co. v. United States, 61 Fed. Cl. 527, 534 (2004) ("[A]ny matter of public record is by definition knowable.  A party will be charged with knowing any facts that are discoverable in public records . . . ." (citation omitted)).

Indeed, it is well settled that "agency procedures must be followed before a binding contract can be formed."  Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429,

1433 (Fed. Cir. 1998) (citing <u>New Am. Shipbuilders, Inc. v. United States</u>, 871 F.2d 1077, 1080 (Fed. Cir. 1989); <u>Am. Gen. Leasing, Inc. v. United States</u>, 587 F.2d 54, 57-58 (Ct. Cl. 1978)).  In <u>American General Leasing</u>, for instance, the parties allegedly reached an oral agreement that was confirmed in writing but never became a binding contract.  587 F.2d at 57.  The United States Court of Claims ("Court of Claims"), the predecessor to the United States Court of Appeals for the Federal Circuit ("Federal Circuit"), observed that (1) a letter confirming the oral agreement included a notation that additional prerequisites needed to be met before the parties could "sign a contract in accordance with the proposal" and (2) applicable regulations required any contracts to be in writing.  <u>Id.</u> at 57-58.  The Court of Claims explained that "[t]he parties may have completed the negotiations that would have led to a contract, but they had not taken the final and essential step of executing an agreement," and found that no valid contract existed.  <u>Id.</u> at 58.

In <u>Harbert/Lummus</u>, another decision that bears on the instant dispute, the Federal Circuit held that a purported oral contract was invalid because it was not authorized under applicable regulations:

> It appears evident that, if [the plaintiff] had examined the [contracting officer's] delegation of authority, it could not have reasonably believed it had entered into a binding contract with the government in the absence of the required written approval by the [contracting officer].  Because there is no evidence of such prior, written approval by the [contracting officer] . . . , we hold that the [contracting officer] lacked the authority to enter into the oral contract and it is therefore not binding upon the government.

142 F.3d at 1433.

In <u>Doe v. United States</u>, another judge of this court relied on <u>Harbert/Lummus</u> when examining whether a valid oral contract existed.  <u>See</u> 58 Fed. Cl. 479, 488-89 (2003), <u>aff'd per curiam</u>, 112 F. App'x 54 (Fed. Cir. 2004) (unpublished decision).  Under the plaintiff's theory of the case, certain government officials entered into an oral contract with him in violation of agency regulations forbidding such contracts.  <u>Id.</u> at 489.  Accordingly, the court found that "no contract [could] exist" because those officials "lacked the requisite authority" since "agency procedures were not followed."  <u>Id.</u>

In <u>American General Leasing</u>, <u>Harbert/Lummus</u>, and <u>Doe</u>, the government officials involved all lacked the authority to enter into oral contracts because agency guidelines proscribed such contracts; thus, the purported oral contracts were held invalid.  Here, the HUD officials involved in the June 24, 2011 negotiations similarly lacked the authority to enter into a binding oral agreement based on the HUD Litigation Handbook's requirements that HUD approval must be in writing, and include the regional counsel's concurrence, following receipt of a written proposal containing justifications for its adoption.  Failure to satisfy any of these three requirements was sufficient to deprive the June 24, 2011 meeting participants of the necessary authority to enter into such an agreement.  <u>See</u> <u>Flexfab, LLC v. United States</u>, 424 F.3d 1254,

1263 (Fed. Cir. 2005) ("[A]ssurances from a government agent, having no authority to give them, cannot expose the government to risk of suit for nonperformance of an obligation that it did not intentionally accept."). Therefore, as in American General Leasing, Harbert/Lummus, and Doe, the purported oral agreement at issue in the instant case is not a valid contract.[15]

### C.  HUD Did Not Ratify the Settlement Agreement

Despite the lack of a valid contract on June 24, 2011, the court's inquiry is not complete. "Agreements made by government agents without authority to bind the government may be subsequently ratified by those with authority if the ratifying officials have actual or constructive knowledge of the unauthorized acts." Harbert/Lummus, 142 F.3d at 1433. "Institutional Ratification may occur when the Government seeks and receives benefits from an unauthorized contract." BioFunction, LLC v. United States, 92 Fed. Cl. 167, 174 (2010) (citing Janowsky v. United States, 133 F.3d 888, 891-92 (Fed. Cir. 1998)); see also Restatement (Third) of Agency § 4.01 (Am. Law Inst. 2006) (defining ratification). "It requires the involvement of government officials who have contracting authority and whose actions demonstrate 'clear acceptance of an unauthorized agreement.'" BioFunction, 92 Fed. Cl. at 174 (quoting Digicon Corp. v. United States, 56 Fed. Cl. 425, 426 (2003)). In addition, "ratification is not effective unless it encompasses the entirety of [a] contract." Restatement (Third) of Agency, supra, at § 4.07; accord id. § 4.01 cmt. b ("A principal must ratify a single transaction in its entirety, thereby becoming subject to its burdens as well as its benefits.").

In Silverman v. United States, for instance, the Court of Claims concluded that the government ratified an agreement "[b]y accepting the benefits flowing from [an unauthorized] promise of payment . . . ." 679 F.2d 865, 870 (Ct. Cl. 1982). In contrast, in City of El Centro v. United States, the Federal Circuit rejected the plaintiff's institutional ratification theory by explaining that (1) an implied-in-fact contract requires both the involvement of a government official with contracting authority and consideration (i.e., benefits received) and (2) the plaintiff had shown neither. 922 F.2d 816, 821-22 (Fed. Cir. 1990). Similarly, in BioFunction, another judge of this court rejected the plaintiff's institutional ratification theory because even assuming, as the plaintiff argued, that the government had "received some benefit from the program" at issue, the plaintiff failed to identify even "one employee with adequate contracting authority who was involved." 92 Fed. Cl. at 174.

It is undisputed that, pursuant to the alleged oral contract, Ms. Weeks was to provide consideration in the form of her resignation and a liability release in exchange for $125,000 and six months of health insurance. HUD effectively received the benefit of Ms. Weeks's resignation on June 24, 2011, when Ms. Weeks vacated her position (or, in any event, on October 28, 2011, when the Opp Housing Authority terminated her employment). In addition, HUD received the benefit of not having its funds used to pay Ms. Weeks beyond July

---

[15]  Because Ms. Weeks failed to establish that a government official with actual authority approved the purported oral agreement on June 24, 2011—one of the prerequisites to a finding of a valid contract with the federal government—the court need not address defendant's remaining arguments that a valid contract did not exist on that date.

29, 2011—even though Ms. Weeks was in a "paid" status up to her termination—after Public Housing (which controls the Opp Housing Authority's funds) froze the Opp Housing Authority's accounts at CCB Community Bank.  Mr. Sprayberry and Ms. Ringhausen, who collectively possessed the necessary authority to obligate Public Housing, participated in the decision to freeze the accounts, which eventually led to Ms. Weeks's termination.  Further, Mr. Sprayberry and Ms. Ringhausen had full knowledge of all the relevant facts when they did so.

In other words, HUD received certain benefits due to the involvement of officials with actual knowledge and the necessary authority.  A principal "may ratify an act . . . by receiving or retaining benefits" if the principal "has knowledge of material facts."  Restatement (Third) of Agency, supra, at § 4.01 cmt. g.  When "a principal retains a benefit" while "manifest[ing] dissent to the agent's act," a "third party may elect to treat the principal's retention of the benefit as a ratification."  Id.  Thus, a third party can hold a principal accountable under an unauthorized agreement if the principal knowingly receives or retains the benefits of the agreement, even if the principal expresses disapproval of such agreement or some portion thereof.  See id. § 4.07 cmt. b ("A person may not, by ratifying an act, obtain its economic benefits without bearing the legal consequences that accompany the act.").  Ms. Weeks is attempting to do just that—i.e., treat HUD's knowing retention of the benefit of her resignation as ratification of the oral agreement to pay her $125,000 in exchange for that resignation despite HUD's rejection of any obligation to approve or provide monetary compensation.

Nevertheless, Ms. Week's ratification theory fails for two independent reasons.  First, a principal does not ratify an act by receiving benefits when the principal has an "independent claim to the benefit."  Id. § 4.01 cmt. g.  Ultimately, HUD did not secure Ms. Weeks's voluntary resignation via a settlement agreement involving Public Housing.  Rather, HUD secured the termination of Ms. Weeks's employment via the Voluntary Compliance Agreement executed between Fair Housing and the Opp Housing Authority.

Second, and more importantly, there was no agreement that could have been ratified.  HUD unambiguously rejected the tentative oral agreement shortly after it was supposedly reached on June 24, 2011.  Indeed, it was a mere four days later when Mr. Sprayberry and Mr. Murray both stated, in a meeting with the Opp Housing Authority, that they did not support the agreement.  After that rejection, there were at least two more rounds of counteroffers, none of which came to fruition.  Two weeks later, in mid-July, the Opp Housing Authority board acknowledged that there was no agreement in place when it retroactively placed Ms. Weeks on paid administrative leave.  Mr. Willis's July 29, 2011 e-mail to Ms. Peterson-Fields expressing his view that it would be "in the best interest of the [Opp Housing Authority] and all concerned that we resolve this issue," DX 15 at 423 (emphasis added), and Ms. Weeks's August 2, 2011 paycheck (for salary through July 29, 2011), provide additional evidence that no settlement had been reached.  Since institutional ratification requires that government officials with contracting authority "demonstrate clear acceptance of an unauthorized agreement," BioFunction, 92 Fed. Cl. at 174 (emphasis added) (internal quotation marks omitted), there must be an agreement in place to be ratified.  Here, HUD unambiguously rejected Ms. Weeks's settlement offer while she was still being paid, and thus HUD cannot be said to have accepted the benefits of a tentative or unauthorized agreement.

In sum, HUD did not subsequently ratify an agreement to compensate Ms. Weeks for her voluntary resignation.

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or unnecessary for resolving the issues currently before the court.

There can be no question that Ms. Weeks was mistreated by HUD and its employees and did not receive due process prior to her termination.  The Opp Housing Authority was presented with a Hobson's choice:  terminate Ms. Weeks or have its funding withheld.  Because the Opp Housing Authority relied almost entirely on HUD for its funding, it had no economically viable alternative but to terminate Ms. Weeks.  The first time that Ms. Weeks became aware that her tenure as executive director of the Opp Housing Authority was in jeopardy was after June 7, 2011, when Fair Housing sent the updated draft Voluntary Compliance Agreement in advance of the planned negotiations that occurred approximately two weeks later.  By that time, HUD had already determined that Ms. Weeks could no longer effectively serve as executive director, and there was no opportunity for her to answer that charge.  (Although Ms. Weeks was aware of certain complaints and compliance issues, the subject of her employment was never previously mentioned.)  Regardless of whether that determination was correct—which is beyond the scope of this case—HUD's efforts to secure Ms. Weeks's termination without any due process are unconscionable and cannot be justified.  Indeed, Judge Mark E. Fuller of the Alabama district court described HUD's behavior as "deplorable," "heavy-handed," and evincing an "apparent lack of appreciation for the crippling consequences of its actions," and observed that "this country has always respected, if not required, a fair process through which an aggrieved party could respond to criticism before suffering such a significant setback as the one suffered by [Ms.] Weeks here—losing her job."[16]  Weeks, 292 F.R.D. at 694 n.3.

_____

[16]  Due process claims are not cognizable in the Court of Federal Claims.  Leblanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995).  When the Court of Federal Claims lacks jurisdiction over a claim, it is empowered to transfer such claim to an appropriate court if doing so "is in the interest of justice."  28 U.S.C. § 1631 (2012).  "Transfer is appropriate when three elements are met:  (1) [t]he transferring court lacks subject matter jurisdiction; (2) the case could have been filed in the court receiving the transfer; and (3) the transfer is in the interests of justice."  Brown v. United States, 74 Fed. Cl. 546, 550 (2006).  The court assumes, for the sake of argument, that Ms. Weeks could have asserted a timely due process claim when she filed her complaint in the instant case.  However, because Ms. Weeks previously presented a due process claim to the Alabama district court, the court finds that allowing Ms. Weeks to amend her complaint (based on the evidence adduced at trial) to add a due process claim before transferring the case would not "serve the interests of justice."  Khalil v. United States, 133 Fed. Cl. 390, 393 (2017) (declining to transfer the case because the plaintiff's claims had already been considered by a district court).

HUD's unconscionable conduct and denial of due process does not, however, affect Ms. Weeks's burden of establishing the existence of an enforceable contract.  The settlement agreement discussed at the June 24, 2011 meeting did not constitute a valid, binding contract, and HUD never ratified that agreement.

Accordingly, the court denies Ms. Weeks's claim for relief.  No costs.  The clerk is directed to enter judgment accordingly.  The clerk shall send a copy of this decision to the HUD Office of Inspector General for review and consideration of next steps, if any.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge